Filed:  June 8, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

─────────────────

No. 98-2140
(CA-97-2134-S)

─────────────────

The Driggs Corporation, et al,

                              Plaintiffs - Appellants,

        versus

Pennsylvania Manufacturers' Association Insur-
ance Company, et al,

                              Defendants - Appellees.

─────────────────

O R D E R

─────────────────

        The court amends its opinion filed May 14, 1999, as follows:

        On page 14, first full paragraph, line 8 -- "January 7, 1996"
is corrected to read "January 7, 199<u>7</u>."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                              ─────────────────────
                                        Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE DRIGGS CORPORATION; THE
DRIGGS GROUP, INCORPORATED,
<u>Plaintiffs-Appellants,</u>

v.

PENNSYLVANIA MANUFACTURERS'
ASSOCIATION INSURANCE COMPANY;
RELIANCE INSURANCE COMPANY,

No. 98-2140

<u>Defendants-Appellees,</u>

and

UNITED STATES FIRE INSURANCE
COMPANY; THE NORTH RIVER
INSURANCE COMPANY; GAVETT AND
DATT, P.C.,
<u>Defendants.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-97-2134-S)

Argued: March 5, 1999

Decided: May 14, 1999

Before HAMILTON and MOTZ, Circuit Judges, and
SMITH, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Elliott Bruce Adler, POWELL, GOLDSTEIN, FRAZER & MURPHY, L.L.P., Washington, D.C., for Appellants. Steven Jay Engelmyer, KLEINBARD, BELL & BRECHER, L.L.P., Philadelphia, Pennsylvania; Joseph Michael Hannon, Jr., THOMPSON, O'DONNELL, MARKHAM, NORTON & HANNON, Washington, D.C., for Appellees. **ON BRIEF:** Lisa E. Brody, Mary Vassallo Slinkard, KLEINBARD, BELL & BRECHER, L.L.P., Philadelphia, Pennsylvania; Randell Hunt Norton, James F. Bromley, THOMPSON, O'DONNELL, MARKHAM, NORTON & HANNON, Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The Driggs Corporation and the Driggs Group, Inc. (collectively Driggs) appeal the district court's grant of summary judgment, see Fed. R. Civ. P. 56(c), to Pennsylvania Manufacturers' Association Insurance Co. (PMA) and Reliance Insurance Co. (Reliance) (collectively the Companies) on: (1) Driggs' action seeking a declaration that PMA and Reliance were required, pursuant to the duty-to-defend provisions of two commercial general liability policies (one issued to Driggs by PMA and the other to Driggs by Reliance), to pay for the independent attorneys that Driggs hired to defend itself in a case brought against it by Colonial Pipeline Company (Colonial) and nineteen of its insurance carriers; and (2) the Companies' counterclaims to recover the $150,000 that the Companies advanced to Driggs for an expert witness in that case. For the reasons that follow, we affirm.

I.

Driggs is a construction company that, in July 1986, constructed a parking lot at a hospital in Reston, Virginia. Near the parking lot was

2

an underground oil pipeline owned and operated by Colonial. On March 29, 1993, nearly seven years after Driggs completed construction of the parking lot, the Colonial pipeline ruptured, spilling petroleum products into nearby navigable waters and onto adjoining shorelines.

In October 1996, as a result of this oil spill, Colonial instituted a lawsuit (the underlying litigation)[1] against Driggs in the Circuit Court of Fairfax County, Virginia, seeking reimbursement for property damage and environmental clean-up costs. Colonial alleged that the pipeline was struck, gouged, and cracked by Driggs either with its heavy equipment or when it placed boulders in the fill adjacent to the pipeline when constructing the parking lot. The underlying litigation sought money damages in excess of $30 million. Driggs removed the underlying litigation to the United States District Court for the Eastern District of Virginia.

Both PMA and Reliance had insured Driggs. Reliance insured Driggs in 1985-1986, so its coverage was effective in July 1986 when Driggs constructed the parking lot. PMA insured Driggs in 1992-1993, so its coverage was in effect on March 29, 1993, when the pipeline ruptured. The primary issues in the underlying litigation were whether Driggs did in fact damage the pipeline and, if so, when the damage occurred. If it were determined that the damage was caused in 1986, the Reliance policy applied. If, however, it were determined that the damage was caused in 1993, PMA's policy applied. It is significant to the present declaratory judgment action brought by Driggs that the date of the damage had no effect on Driggs; in either situation, Driggs was insured for any potential damage to the pipeline. The date of the damage to the pipeline was only relevant to determine whether the policy from PMA or the policy from Reliance was applicable.

Both the policy from PMA and the policy from Reliance provided general coverage for personal injury and property damage suffered or caused by Driggs during the relevant policy periods. Each policy generally provided coverage for:

_____

[1] As noted earlier, the underlying litigation was initiated by Colonial and nineteen of its insurance carriers.

(1) The "bodily injury" or "property damage" that is caused by an "<u>occurrence</u>" that takes place in the "coverage territory," and

(2) The "bodily injury" or "property damage" occurs during the policy period.

(J.A. 1069)(emphasis added).**2** The Policies also contained a duty-to-defend provision which states that "[the Companies] will have the right and duty to defend any `suit' seeking . . . damages." <u>Id.</u>

The Policies contain absolute pollution exclusion clauses. These clauses exclude the payment of damages, fines, penalties, and remediation costs arising out of the discharge, dispersal, migration, release, or escape of pollutants.

After receiving proper notification of the underlying litigation from Driggs, both PMA and Reliance agreed to undertake Driggs' defense. On November 14, 1996, PMA designated the law firm of Gavett & Datt, P.C. (G&D) to defend Driggs in the underlying litigation. Reliance agreed to split defense costs with PMA and also assigned representation of the underlying litigation to G&D.

At an unspecified point in time, PMA claims adjuster, Mark Travis, called Geoffrey Gavett, one of the attorneys at G&D, to ask his advice about a matter "completely different" from the underlying litigation. (J.A. 1470). It was not unusual for Travis to contact Gavett because PMA had consulted and retained G&D in other matters in the past. In the course of his conversation with Gavett, Travis raised the issue of potential coverage disputes in the Driggs matter, although initially not disclosing Driggs by name. Gavett testified as follows about his conversation with Travis:

_____

**2** The policy provisions excerpted herein are taken from the PMA policy. Parallel provisions with substantially similar language are found in the Reliance policy. Any differences between the two policies' provisions do not affect the present dispute. Accordingly, for purposes of clarity, we will refer to the policy from PMA and the policy from Reliance collectively as the "Policies."

4

> [Travis] raised the fact that he had a claim in front of him from Virginia involving a ruptured oil pipeline; wanted to know what the view of trigger of coverage and oil pollution or pollution in Virginia was.
>
> I explained that there was very little in the way of coverage case law in Virginia, and I think that we also -he asked, well, what is typically done in these cases. I explained that usually they are accepted under a reservation of rights, defended.
>
> If they are - if there is a judgment at the end of the case, there may have to be a declaratory judgment action. At that point, he said, well, let me send this down for your review, and I said, before you do that, let me clear any conflict. He said this involves Driggs. I said, I can't do that[be]cause I'm already representing Driggs. I could help you on the defense; I could not help you on the coverage issue.
>
> He asked for a reference for any other counsel that might handle coverage. I gave him both Mr. Norton's name and the firm of Carr, Goodson & Lee. He asked about Mr. Norton and I gave him some background on him and that was it.

(J.A. 1470-71). Travis discussed with Gavett that the pipeline rupture had occurred, that the pipeline was located in Virginia, and that at least two possible trigger dates existed: the date of the installation of the parking lot in 1986 and the date the pipeline ruptured in 1993. Further, Travis testified that his conversation with Gavett led him to the conclusion that separate counsel would be necessary for a potential coverage dispute.

Subsequently, in February 1997, PMA retained Randell H. Norton, Esquire, who was recommended to PMA by Gavett, to represent it in any coverage dispute with Driggs. Around the same time, Reliance retained Steven J. Engelmyer, Esquire, to represent it in any coverage dispute with Driggs. Norton and Engelmyer then sent letters (one from PMA and one from Reliance) to Driggs which explained that: (1) subject to the reservation of their rights, the Companies would

5

defend Driggs in the underlying litigation; (2) the Companies had retained G&D to defend Driggs in the underlying litigation; and (3) the pollution exclusion would apply to exclude coverage for all claims regarding response costs as a result of the discharge of oil.

Driggs alleges that it had immediate concerns regarding the retention of G&D by the Companies. First, Driggs felt that a prior relationship between PMA and G&D, including a number of past matters in which G&D represented PMA in coverage disputes, was a conflict whereby the Companies might have the opportunity to "steer" the litigation to characterize certain damages as covered or uncovered, particularly with respect to the absolute pollution exclusion clauses. Second, Driggs believed that G&D was, by virtue of both experience and resources,[3] incapable of handling a $30 million environmental lawsuit in the Eastern District of Virginia with its "so-called `rocket docket.'" (J.A. 1614). Driggs brought forth two experts to testify on this latter concern. David M. Cleary testified that G&D

> did not appear to have the experience or staff reasonably required for this type of litigation, let alone for the 6-month period of time required [in the Eastern District of Virginia]. . . . Based on this assessment, it is my opinion that the firm of [G&D] was not a reasonable choice to conduct the defense of the [underlying litigation] on behalf of Driggs.

(J.A. 1614). The second of Driggs' experts, John E. Heinz, testified:

> I do not believe that a law firm [of G&D's size], no matter how qualified and experienced, would have been able to successfully defend this litigation under the time constraints imposed by the Eastern District [of Virginia] and in response to the vigorous pursuit of discovery by the three law firms representing the plaintiffs [in the underlying litigation].

_____

[3] G&D is a five-person firm, two of whom were recent members of the Virginia bar. Driggs alleges that the firm did not have the experience necessary to handle complex environmental lawsuits.

6

(J.A. 1624).

Driggs, allegedly in response to its concerns, retained the law firm of Kirkpatrick & Lockhart, LLP (K&L) because of K&L's extensive legal resources and experience both in environmental litigation and in the Eastern District of Virginia. Driggs also retained K&L to render advice on the insurance coverage dispute between Driggs and the Companies. In a letter dated March 3, 1997, Driggs informed the Companies that, in Driggs' opinion, G&D was not competent to defend the underlying litigation. Driggs stated:

> As you are also aware, Driggs has retained the firm of [K&L] to defend the [underlying litigation] for three reasons: (1) Driggs believes that a conflict of interest has arisen between Driggs and its insurers, entitling Driggs to choose counsel at the expense of the insurers; (2) Attorney Gavett's relationship with PMA renders him unable to represent truly independently the interests of Driggs, especially to the extent the insurers' interests conflict with Driggs' best interests; and (3) Attorney Gavett's firm lacks the manpower, resources and expertise necessary to defend Driggs adequately in the large, complex [underlying] litigation.

(J.A. 1058). Accordingly, Driggs requested that the Companies pay for K&L's representation and "reconsider whether it is necessary to continue Attorney Gavett's role as co-counsel." (J.A. 1059).

The Companies refused to pay K&L and continued to insist that G&D represent Driggs in the underlying litigation. It is undisputed that K&L assumed the lead in representing Driggs in the underlying litigation, although G&D did participate, to some degree, during every aspect of the litigation. According to Driggs, it only continued to work with G&D out of concern that it not violate the Policies' clauses which required Driggs to cooperate with the Companies in their defense of the underlying litigation.

The Companies also refused to pay for some of the expenses incurred by Driggs. On May 23, 1997, approximately two weeks before the trial in the underlying litigation was scheduled to begin, K&L informed the Companies that $150,000 was needed to ensure

7

the attendance at trial of one of Driggs' engineering experts, Dr. Geoffrey R. Egan of Aptech Engineering. The Companies refused to pay for Dr. Egan, claiming that Driggs violated the Policies' clauses which state:

> Duties in the Event of Occurrence, Claim or Suit : . . . (d) No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(J.A. 1076). Driggs alleges, however, that even though it was not relying primarily on G&D for representation, the Companies were aware that experts needed to be retained and, in fact, were retained. Driggs also put forth testimony by Thomas Holt, K&L's lead counsel in the underlying litigation, that G&D did not object when experts were retained.

After refusing to pay for Dr. Egan, K&L wrote to the Companies stating that

> refusal to pay these invoices will seriously jeopardize Driggs' financial position. . . . At the present time, Dr. Egan will not be available to testify unless he is paid. If PMA does not pay these invoices, Dr. Egan will not testify and Driggs will have to consider PMA directly liable for any and all consequences.

(J.A. 1674). After receiving this letter, the Companies forwarded the requested $150,000 (Reliance and PMA paid $75,000 each) to Driggs, who in turn advanced it to K&L to pay Dr. Egan. When the Companies forwarded the money, however, they reserved their right to recover it from Driggs in the future.

On June 10, 1997, seven months after it was commenced, the underlying litigation went to trial before a jury. Following Colonial's presentation of its evidence, the district court granted Driggs and its co-defendants judgment as a matter of law. Colonial appealed and this court affirmed the district court in an unpublished per curiam opinion. See Colonial Pipeline Co. v. The Driggs Group, Inc., 155 F.3d 558, 1998 WL 390570 (4th Cir. 1998).

8

On April 23, 1997, Driggs filed this declaratory judgment action in the Circuit Court for Baltimore County, Maryland, seeking a declaration that the Policies' duty to defend provisions required the Companies to pay for the independent attorneys, K&L, that Driggs hired to defend itself in the underlying litigation. On July 3, 1997, the Companies removed this matter to the United States District Court for the District of Maryland.

On July 9, 1997 and October 27, 1997, Reliance and PMA, respectively, asserted counterclaims against Driggs for the $150,000 that the Companies advanced to Driggs for the engineering expert in the underlying litigation.

On April 1, 1998, the Companies filed a motion to dismiss Driggs' complaint, or in the alternative, for summary judgment. On May 4, 1998, the district court granted the Companies' motion for summary judgment, concluding that an actual conflict of interest did not exist, and Driggs was not entitled to payment of K&L's fees by the Companies. On May 29, 1998, the Companies moved for summary judgment on their counterclaims. On June 15, 1998, Driggs filed its opposition to the Companies' motion for summary judgment on the Companies' counterclaims and filed a cross-motion for summary judgment on the Companies' counterclaims. On July 20, 1998, the district court granted the Companies' motion for summary judgment on their counterclaims, denied Driggs' cross-motion for summary judgment, and awarded the Companies $150,000 plus costs and interest. In granting the Companies' motion for summary judgment on their counterclaims, the district court concluded that the Companies were entitled to be reimbursed for the $150,000 they advanced Driggs because Driggs' retention of Dr. Egan without the prior approval of the Companies was in direct contravention of the Policies' explicit terms. Driggs noticed this timely appeal.

II.

On appeal, Driggs first claims that the district court erred when it determined that: (1) no conflict of interest existed between the Companies and G&D; and (2) the Companies did not breach their duty to defend by hiring G&D to defend Driggs in the underlying litigation. Consequently, Driggs claims that the district court erroneously

9

granted summary judgment to the Companies in the declaratory judgment action. We review the district court's grant of summary judgment in favor of the Companies de novo, employing the same standards applied by the district court. See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 123 (4th Cir. 1994).

Because the Policies were entered into in Maryland, the parties agree that Maryland law applies when determining the parties' rights and obligations under the Policies. See Aetna Casualty & Sur. Co. v. Souras, 552 A.2d 908, 911 (Md. App. 1989). The general rule under Maryland law is that an insurer has the right to select counsel and to control the defense of the underlying litigation. See Allstate Ins. v. Campbell, 639 A.2d 652, 658 (Md. 1994). While the insured and the insurer usually have compatible interests, their respective interests may diverge at times, creating a potential or actual conflict of interest. See id. Maryland has rejected a per se rule whereby the insurer is required to pay for the insured's independent counsel any time that the insured's objectives might differ from the objectives of the insurer. See Cardin v. Pacific Employees Ins. Co., 745 F. Supp. 330, 336 (D. Md. 1990). However, when an actual conflict of interest does exist, an insurer's duty to defend necessarily involves the duty to pay for the insured's independent counsel. See Brohawn v. Transamerica Ins. Co., 347 A.2d 842, 854 (Md. 1975).

Maryland law is clear that an actual conflict of interest does not exist merely because an insurer defends its insured subject to a reservation of rights. See Cardin, 745 F. Supp. at 336. However, an actual conflict of interest does exist when there is a coverage dispute and the same counsel represents both the insurer and the insured. See Brohawn, 347 A.2d at 852-54.

Driggs argues that the Companies' prior relationship with G&D and Gavett's conversation with Travis gave rise to an actual conflict of interest entitling Driggs to hire independent counsel at the Companies' expense. This argument has no merit.

It is clear that an actual conflict of interest does not exist when counsel appointed by the insurer is specifically instructed to defend the insured without consideration of the insurer's interest. See Cardin, 745 F. Supp. at 337-38, cited with approval in Campbell, 639 A.2d

10

at 659 n.4. The Companies so instructed G&D, stating as follows in a letter to Driggs:

> Because the defense is being assumed under the reservation of rights described in this letter, Mr. Gavett has been instructed by PMA, and is being instructed by Reliance, that his responsibility in this case will be to defend Driggs' interests, and not to represent PMA or Reliance or to protect the interests of PMA or Reliance to the detriment of Driggs.

(J.A. 855). The record reflects that G&D repeatedly reassured Driggs of this position, both orally and by letter. Further, during his conversation with Travis, Gavett of G&D, pursuant to his ethical obligations, specifically declined to discuss the potential coverage dispute between Driggs and the Companies and recommended to Travis that the Companies retain separate counsel. After this conversation, PMA hired Norton and Reliance hired Engelmyer to represent them in the coverage dispute. Accordingly, neither the Companies' prior relationship with G&D nor Gavett's conversation with Travis gave rise to an actual conflict of interest.

Driggs also argues that PMA, having had a relationship with G&D in the past, was in a position to "steer" the underlying litigation toward either: (1) a particular date for the accident's occurrence; or (2) the Policies' absolute pollution exclusion clauses. As to the date for the accident's occurrence, the damage to Colonial's pipeline occurred either in 1993, when the pipeline ruptured and PMA insured Driggs, or 1986, when Driggs constructed the parking lot and Reliance insured Driggs. Therefore, even if Driggs' steering allegation were taken as true, Driggs cannot demonstrate how such steering would have worked to Driggs' detriment because under either scenario Driggs would have been insured either by Reliance or PMA.

As to the Policies' absolute pollution exclusion clauses, Driggs alleges that an actual conflict of interest resulted from the prior relationship between PMA and G&D because G&D could have steered the trial toward the Policies' absolute pollution exclusion clauses, i.e., argued that the petroleum products contained in the pipeline caused the consequential environmental damage instead of the pipeline itself, thereby protecting the Companies and leaving Driggs open to exces-

11

sive liability. This argument is similarly without merit. While the underlying litigation questioned who and what caused Colonial's pipeline to rupture, it was undisputed that the petroleum products contained in the pipeline, and not the pipeline itself, was the cause of the consequential environmental damage. Further, Driggs did not contest the scope or applicability of the Policies' absolute pollution exclusion clauses in the underlying litigation. In fact, Driggs concedes that the Policies' absolute pollution exclusion clauses would have prevented it from recovering from either PMA or Reliance for any consequential environmental damages had such damages been awarded to Colonial in the underlying litigation. Accordingly, in the absence of any dispute over the scope or applicability of the Policies' absolute pollution exclusion clauses in the underlying litigation, Driggs cannot demonstrate how any alleged potential for steering by G&D could have resulted in detriment to Driggs.

Driggs also claims that the Companies violated their duty to defend because, in Driggs' opinion, G&D did not have the experience or resources necessary to properly defend the underlying litigation. This argument is unavailing. G&D was capable of properly defending Driggs in the underlying litigation. K&L, while a much larger law firm with more resources than G&D, would not and did not dedicate all of its resources to the underlying litigation. In contrast, Gavett testified that G&D, while only a five-person law firm, hires extra paralegals and extra attorneys (on a contract basis) when the firm undertakes a large and complex matter like the underlying litigation involving Driggs. Despite Driggs' disagreement with the Companies' choice, the retention of G&D was not a breach of the Companies' duty to defend Driggs. It is settled law in Maryland that an insurer does not breach its duty to defend merely because the insured disagrees with the manner in which he or she is being defended. See Roussos v. Allstate Ins. Co., 655 A.2d 40, 44 (Md. App. 1995); see also Cardin, 745 F. Supp. at 336-38. Therefore, the Companies did not breach their duty to defend Driggs by retaining G&D to defend Driggs in the underlying litigation and refusing to pay for K&L.

Because the Companies instructed G&D to zealously defend Driggs in the underlying litigation and because G&D did not represent either party, let alone both, in the coverage dispute, an actual conflict of interest did not exist. Therefore, Driggs, while entitled to

12

retain independent counsel, is not entitled to payment of that independent counsel by the Companies. Further, because G&D was capable of defending Driggs in the underlying litigation, the Companies did not breach their duty to defend Driggs by retaining the law firm of G&D to defend Driggs in the underlying litigation. Accordingly, the district court properly granted the Companies' motion for summary judgment in the declaratory judgment action brought by Driggs.

III.

Driggs also appeals the district court's grant of summary judgment in favor of the Companies on the Companies' counterclaims. Through their counterclaims, the Companies sought to recover the $150,000 they paid to Driggs, approximately two weeks before the trial in the underlying litigation was scheduled to begin, in response to K&L's assertion that an expert witness, Dr. Egan of Aptech Engineering, would not testify at trial unless he received his payment in advance. The district court held that the Companies were entitled to reimbursement of the amount advanced to Driggs for Dr. Egan because Driggs had not received the Companies' prior approval as required by the Policies. We agree.

The Policies contain the following clause:

> Duties in the Event of Occurrence, Claim or Suit : . . . (d) No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(J.A. 1076).

The Companies assert that they are entitled to recover the $150,000 paid to Dr. Egan because Driggs did not receive the Companies' prior approval as required by the Policies. The first time the Companies were made aware of Dr. Egan's retention was on May 23, 1997, when Driggs requested payment to Dr. Egan by PMA. The Companies initially refused to pay for Dr. Egan. Driggs, through K&L, replied to the Companies that

13

> refusal to pay [for Dr. Egan] will seriously jeopardize
> Driggs' financial position. . . . At the present time, Dr. Egan
> will not be present to testify unless he is paid. If[the Com-
> panies do] not pay these invoices, Dr. Egan will not testify
> and Driggs will have to consider [the Companies] directly
> liable for any and all consequences.

(J.A. 1974). Thereafter, the Companies advanced Dr. Egan the requested $150,000 but reserved the right to recover that amount from Driggs.

Under Maryland law, the duty to defend, including the payment of fees and expenses related to that duty, is a contractual obligation. See Campbell, 639 A.2d at 658; Brohawn, 347 A.2d at 850. That being the case, Driggs was bound to conform with the terms and conditions of the Policies. The Policies required Driggs to obtain the Companies' approval prior to assuming any obligation. It is undisputed that Driggs did not comply with this requirement. Driggs retained Dr. Egan on January 7, 1997. The first time the Companies were made aware of Dr. Egan's retention was on May 23, 1997, when Driggs requested that the Companies pay $150,000 to Dr. Egan. Accordingly, it is undisputed that Driggs' retention of Dr. Egan without the prior approval of the Companies was in direct contravention of the Policies' explicit terms.

Driggs argues that, in all events, the defense of the underlying litigation, a large complex environmental case, would necessarily involve expert witnesses. Accordingly, Driggs argues that the Companies would have had to pay expert witness fees regardless of which law firm undertook Driggs' defense. This argument is not persuasive in light of the Policies' explicit provisions that reserve to the Companies the right of prior approval of all expenses. There are any number of reasons why the Companies would want to pre-approve expenses, especially a large expense like the $150,000 paid to Dr. Egan. To preserve their right of prior approval, the Companies took the affirmative step of inserting an explicit provision in the Policies reserving them that right. Driggs' argument does not warrant the defiance of such unambiguous provisions in the Policies. See University of Baltimore v. IZ, 716 A.2d 1107, 1120-21 (Md. App. 1998) (holding that if contractual language is clear and unambiguous, the court must enforce its

14

terms). Accordingly, we affirm the district court's grant of summary judgment in favor of the Companies on their counterclaims to recover the $150,000 the Companies advanced Driggs to pay Dr. Egan.

IV.

For the reasons stated herein, we affirm the district court's grant of summary judgment in favor of the Companies on both the declaratory judgment action brought by Driggs and the Companies' counterclaims to recover the $150,000 the Companies advanced Driggs to pay Dr. Egan.

AFFIRMED

15